UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | No. 0:20-cr-49-NEB-KMM |
| Plaintiff, | |
| v. | **Report and Recommendation** |
| Gary Robert Drake, | |
| Defendant. | |

Gary Robert Drake is charged with two counts of Access with Intent to View Child Pornography and one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and § 2252(b)(2). [Indictment, ECF No. 1 at 1–3.] This matter is before the Court for a report and recommendation on his Motion to Suppress Evidence and a Motion to Suppress Statements. [ECF Nos. 26, 33.] Mr. Drake generally argues (1) that the probationary search of his phone violated his Fourth Amendment rights; (2) that the warrantless search of his home and the seizure and search of electronic devices violated his Fourth Amendment rights; (3) that the January 22, 2019, federal search warrant was issued without an adequate showing of probable cause; (4) that the affidavit upon which the warrant was founded contained misrepresentations that were either intentional or in reckless disregard for the truth; and (5) that an item was improperly seized from his home and searched because it was not included in the warrant.[1] [ECF No. 33.] For the reasons that follow, the Court recommends that Mr. Drake's motions be denied.

**I.     Background**

---

[1] The undersigned issued the federal warrant that is at issue in this case. Accordingly, the Court referred the third and fifth of the issues raised by Mr. Drake to another magistrate judge for a separate report and recommendation.

1

In January of 2007, Mr. Drake pled guilty in Dakota County to two counts of criminal sexual contact. [Motion Hearing Transcript (hereinafter, "Tr.") at 16; *see* Detention Order, ECF No. 23 at 2.] His 21-month prison sentence was stayed, and he was placed on probation for 25 years and required to register as a predatory offender for the remainder of his life. Mr. Drake signed a probation agreement on January 31, 2007. [Government's Mot. Hr'g Ex. (hereinafter, "Ex.") 1; Tr. at 39.] Among the terms of his probation was the requirement that Mr. Drake have no unsupervised contact with minors without authorization from his probation officer. [Ex. 1 at 2.] The probation agreement also provided that "[a] probation officer has the authority to conduct unannounced searches of your person, vehicle, computer or any other property owned, leased, used or under your control." [Ex. 1 at 1.]

In 2008, Mr. Drake violated the terms of his probation by having unsupervised and unauthorized contact with minors. [Tr. at 19; Ex. 8.] As a result, he was subject to additional conditions, which included "random computer audits," no internet access without his probation officer's consent and monitoring, and no "internet, magazines, TV programs or other forums featuring under-age girls between the ages of 7 and 15." [Ex. 8; Tr. at 20–21.] In 2009, the terms of Mr. Drake's probation were again modified following another violation—this time, Mr. Drake's access to the internet was revoked entirely, he was not to access pornographic material, and he was to "comply with random searches." [Tr. at 21.]

By 2017, Mr. Drake moved into his parents' home in Ramsey County, his probation was transferred to Ramsey County Community Corrections, and he was eventually assigned a new probation officer—Elizabeth Kovacs—with whom he was to meet on a quarterly basis. [Tr. at 16, 25–26, 38.] In August of 2018, Mr. Drake met with Ms. Kovacs to review his probation agreement, the predatory offender registration, and an Internet Phone Agreement which permitted him to have and use a cellphone with internet access provided that he abide by the terms of the agreement. [Ex. 2; Tr. at 22.] The Internet Phone Agreement provided as follows:

> By signing this agreement, you will allow Ramsey County Probation/Parole to have the ability to have access to your phone at any time. This includes you providing Ramsey County Probation/Parole with the following information:
> - Passwords/designs to unlock the phone
> - Email addresses/passwords used or associated with the phone
> - Random searches of the phone wherever you are asked, at any time or whether to any location
> - Random computer generated searches of the phone with equipment operated by Ramsey County Probation/Parle [sic] agents, or any other designee

[Ex. 2.] Mr. Drake signed the agreement on August 16, 2018. [Tr. at 23–25.]

On November 27, 2018, Mr. Drake again met with Ms. Kovacs. [Tr. at 25–26.] Ms. Kovacs asked Mr. Drake to turn over his cellphone for a random search. [Tr. at 26.] He surrendered the phone, and while it was being searched by another parole officer, Ms. Kovacs reviewed a new agreement pertaining to internet usage with Mr. Drake. [Tr. at 26–27.] Ms. Kovacs testified that probation created the new document because, by court order, Mr. Drake's probation was conditioned on internet-use restrictions. [Tr., ECF No. 50 at 27.]

The Electronic Device Agreement was broader in scope than the Internet Phone Agreement, as its conditions applied to "any electronic device owned or possessed by [Mr. Drake,]" including "iPod[s], iPad[s], iPhone[s], smartphones, tablets, laptop computers, desktop computers, external hard drives, thumb drives, USB drives, gaming consoles, SIM/SD cards and Wi-Fi enabled televisions." [Ex. 3 at 1]. The conditions required, in relevant part, that Mr. Drake "provide a complete and accurate inventory of all electronic devices [he] owned, possessed, and/or used," as well as "all usernames and passwords for all accounts located on [his] electronic devices or on the web;" and that he refrain from using "any electronic device for any purpose which might further sexual activity . . . [including] possessing or viewing of material that is sexual in nature;" [Ex. 3 at 1-2.] The Electronic Device Agreement

further provided that Mr. Drake "has no expectation of privacy regarding the use of any electronic device or the information stored on any electronic device;" that he

> consents to unannounced search and examination at any time and for any reason, with or without reasonable suspicion, by Supervising Agent/Designee, of any and all electronic devices to which [he] has access, possession, or control, for the purposes of detecting content prohibited by this Agreement and/or determining compliance with conditions of probation/parole;

and that he "understands and agrees that [his] electronic devices are subject to seizure by the supervising Agent/Designee if, during a search, any evidence of a violation or any evidence of a new crime is indicated." [Ex. 3 at 2.] Finally, the agreement provided that Mr. Drake "understands that if [he] declines to sign this agreement, [he] will not be allowed to own or possess any electronic device." [Ex. 3 at 1.] Mr. Drake signed the Electronic Device Agreement and disclosed the electronic devices and accounts to which he had access: a Velocity desktop computer, an @msn.com email address, and a Facebook account. [Ex. 3 at 3–4; Tr. at 30–31.]

Before the meeting between Mr. Drake and Ms. Kovacs concluded, Ms. Kovacs was informed that the search of Mr. Drake's phone revealed "concerning searches." [Tr. at 31.] Ms. Kovacs testified that she told Mr. Drake that he could go home and, if they finished the search in time, she would return his phone to him later that day. [Tr. at 31.]

Ms. Kovacs testified that the search of Mr. Drake's phone revealed that the phone had been connected to other devices which Mr. Drake had not disclosed and of which the probation officers were unaware—namely, "external drives and a Windows computer"—and that these devices had been accessed "recently." [Tr. at 32–34.] Ms. Kovacs also testified that searches for "pornographic material," as well as "preteen models," "minor body parts," "model casting, and other related sexually-explicit subjects" were found on Mr. Drake's phone. [Tr. at 33–34.] She testified that these searches were violative of Mr. Drake's probation conditions. [Tr. at 33.]

4

That evening, Ms. Kovacs and another probation officer went to Mr. Drake's house and confronted him about the results of the search of his phone. [Tr. at 34.] At their request, Mr. Drake eventually allowed the probation officers into his house and led them to the basement, where his room was located, to search for the other electronic devices. [Tr. at 34.] Ms. Kovacs testified that they found the Velocity computer and a Western Digital external Hard Drive in Mr. Drake's bedroom, and that they found a Gateway computer in a common living area of the basement. [Tr. at 34–35, 45.] The probation officers confiscated the devices. [Tr. at 35.]

Ms. Kovacs testified that their searches of the devices revealed "internet searches related to minor females engaging in sexual activity, sex cam live forums, casting models, minor Russian, and many other casting modeling agency photo shoots, and other concerning pornographic-related searches," as well as images of alleged child pornography. [Tr. at 36.] Ms. Kovacs issued Mr. Drakes a probation violation and turned the electronic devices over to Detective Mark Ganley with the Roseville Police Department. [Tr. at 37.]

Detective Ganley called Mr. Drakes on December 5, 2018, for an interview. [Ex. 7.] The following are relevant portions from the transcript of that interview:

| | |
|---|---|
| Detective Ganley: | Good umm see we should probably pick a time to pick up and talk about your computer |
| Mr. Drake: | Okay umm |
| Detective Ganley: | So you know what's going on right now right? |
| Mr. Drake: | I do, yeah, yeah very much aware of it |
| Detective Ganley: | Alright so the burning question is this[,] I have not sent the computer yet to the lab for forensics[,] ya know we both know that there's images on there that shouldn't be on there right[?] |

5

| | |
|---|---|
| Mr. Drake: | Correct |
| Detective Ganley: | Alright[,] are any of these homemade or did you just download them[?] |
| Mr. Drake: | Download them |
| Detective Ganley: | Okay so you did not make any of these images[?] |
| Mr. Drake: | Absolutely not |

. . .

| | |
|---|---|
| Detective Ganley: | . . . Okay[,] alright how many images do you think[,] including movies[,] do you think are on your computer? . . . just the videos[,] how many would you say? |
| Mr. Drake: | Maybe—I may be off, maybe ten |
| Detective Ganley: | Okay and how many pictures? |
| Mr. Drake: | Way too many |
| Detective Ganley: | Okay like what does that mean[,] like a hundred, a thousand[?] |
| Mr. Drake: | It could be a thousand |

[Ex. 7 at 2–3; Ex. 6 (audio).] Detective Ganley applied for a state search warrant that was never actually executed. [Ex. 5.] His affidavit for that warrant stated that he had

> conducted a telephonic interview with Gary Drake. . . . He admitted viewing and downloading child pornography from numerous websites. He denied manufacturing the media, nor disseminating/trading child pornography with others. He admitted the external hard drive contained about 20 videos of child pornography erotica. He also admitted the external hard drive contained over one thousand images of child pornography/erotica."

6

[Ex. 5 at 4].

On December 27, 2018, Detective Ganley transferred custody of the computers to FBI Agent Robert Blackmore. [Ex. 4 at ¶16.] Agent Blackmore applied for and received a federal search warrant for Mr. Drake's seized computers and hard drives. In his supporting affidavit, Agent Blackmore reiterated the paragraph from Detective Ganley's affidavit regarding Detective Ganley's interview with Mr. Drake. The warrant was issued by the undersigned judge on January 22, 2019.

The second search of the computers revealed evidence of child pornography. The United States charged Mr. Drake with two counts of Access with Intent to View Child Pornography and one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and § 2252(b)(2). [Indictment, ECF No. 1 at 1–3.] Mr. Drake brought the motions at issue here, and the Court held a hearing on September 1, 2020.

## II.   DISCUSSION

Mr. Drake raises several challenges to the legality of the seizure and searches of his electronic devices. This Report and Recommendation will address the legality of the probationary searches and seizures and will then consider Mr. Drake's assertion, raised under *Franks v. Delaware*, that the affidavit submitted in support of a warrant to search the devices a second time contained material misstatements. The two challenges to the federal search warrant itself—both "four corners" challenges—will be addressed by Magistrate Judge Tony Leung in a separate Report and Recommendation.

### A. The Probationary Searches

#### 1. Legal Standard

The Fourth Amendment of the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When considering the reasonableness

7

of a search under the Fourth Amendment, courts consider the totality of the circumstances and balance "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of a legitimate governmental interest." *Samson v. California*, 547 U.S. 843, 848 (2006) (quotation omitted). Whether the individual raising the Fourth Amendment claim was a "probationer subject to a search condition informs both sides of that balance." *United States v. Knights*, 534 U.S. 112, 119 (2001).

With respect to a person's expectation of privacy, "probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id.* A probationer's reasonable expectation of privacy is already diminished because probation, like other punitive measures for criminal acts, may deprive the offender of some of the freedoms citizens otherwise enjoy by default. *United States v. Makeeff*, 820 F.3d 995, 1000 (8th Cir. 2016) (citing *Knights*, 534 U.S. at 119) The probationer's reasonable expectation of privacy is further diminished—significantly so—if he consents to a search condition. *Id.*; *United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003).

On the other end of the balancing scale, it is well-established that the government has a heightened interest in searching probationers. This is because "'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" *Makeeff*, 820 U.S. at 1000 (quoting *Knights*, 534 U.S. at 120). The government has a "dual interest in integrating probationers back into the community and combating recidivism," and "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence." *Samson*, 547 U.S. at 849.

The balance of these interests has led the Supreme Court to the following rule: "When an officer has reasonable suspicion that probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interest is reasonable." *Id.* at 849–50.

The different punishments for criminal convictions governments have at their disposal exist on a continuum in terms of their impact upon a person's expectation of privacy. *See id.* at 848. On one end of this continuum is imprisonment, where persons convicted of crimes have no reasonable expectation of privacy. *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984). A less severe punishment is supervised release, less severe than that is parole, and lesser still is probation. *Makeeff*, 820 F.3d at 1001. The Supreme Court has held that, in the parole context, if the parolee is subject to a suspicionless search condition, there need not even be reasonable suspicion for a search to withstand Fourth Amendment scrutiny. *Samson*, 547 U.S. at 857. Here, however, Mr. Drake was a probationer at the time his phone was searched; and it remains an open question with the Supreme Court whether a search of a probationer may be constitutionally predicated on less than reasonable suspicion.

## 2. The Phone Search

Mr. Drake contends that, in this case, the probation officers needed to have reasonable suspicion that he was engaging in criminal activity before they could legally search his phone. The government does not contend that the probation officers had reasonable suspicion to search Mr. Drake's phone, but argues that Mr. Drake misconstrues the law in claiming that such suspicion is required.

Initially, the Court notes that each side relies upon one aspect of the applicable law but overlooks another. The government is correct that neither the Supreme Court nor the Eighth Circuit has held that reasonable suspicion is automatically required in this context, and the cases Mr. Drake relies on do not do so. Mr. Drake first cites *Knights* for this proposition, but the *Knights* Court noted that reasonable suspicion and a search condition were both present, and it explicitly left open the question of whether the search condition alone would be sufficient in certain contexts—a question the Supreme Court later answered in the affirmative for the parolee in *Samson*. *Id.*; *Knights*, 534 U.S. at 120 n.6 ("The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion."). Mr. Drake

9

also cites *Makeeff* in support of his contention that the search condition did not "obviate the need for some form of reasonable suspicion." [Drake Mem. Supp. Mot. to Suppress, ECF No. 51 at 13.] However, *Makeeff* only echoed *Samson* by observing that "*no more than* reasonable suspicion" is necessary, and it held that the search at issue there was supported by reasonable suspicion. It did not determine whether less suspicion would suffice in the presence of a suspicionless search condition.

For its part, the phrasing of the government's argument that "Supreme Court precedent [has] held that random search provisions of convicted persons are constitutionally permissible" side-steps the issue concerning the status of the convicted person. [Gov't Mem. Opp. Mot. to Suppress, ECF No. 54 at 11–12.] The government cites a number of different cases, and while all lend support to its general assertion that "search conditions of those convicted of crimes do not require reasonable suspicion," none directly answer the question presently before the Court: whether reasonable suspicion is required under the Fourth Amendment to search a *probationer's* cellphone under these circumstances. [Gov't Mem. Opp. Mot. to Suppress, ECF No. 54 at 14] (citing *Samson*, 547 U.S. 843 (parole context); *United States v. Jackson*, 866 F.3d 982 (8th Cir. 2017) (supervised-release context); *United States v. Hamilton*, 591 F.3d 1017 (8th Cir. 2010) (parole context); *United States v. McCoy*, No. 15-cr-20, 2015 WL 9216566 (D. Minn. Dec. 17, 2015) (finding, in released-pending-appeal context, that the search was supported by reasonable suspicion and declining to answer whether such a finding would be necessary); *United States v. Cain*, 8-cr-26, 2008 WL 2498176 (D. Minn. May 21, 2008) (finding reasonable suspicion in an intensive-supervised-release context)). And this distinction is important. *See United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (overruling three of its pre-*Samson* cases, and three subsequent cases relying on them, "to the extent they hold that there is no constitutional difference between probation and parole for purposes of the [F]ourth [A]mendment," because they "conflict with the Supreme Court's holding that parolees have fewer expectations of privacy than probationers" (quotations omitted)).

Neither the Supreme Court nor the Eighth Circuit have answered whether a suspicionless search of a probationer subject to a suspicionless search condition is per se permissible under the Fourth Amendment. However, other courts have. In *United States v. King*, the defendant was on probation and subject to the following condition: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole, or probation officer." 736 F.3d 805, 806 (9th Cir. 2013), *cert. denied*, 571 U.S. 1239 (2014). Having established that this search condition was clearly expressed and that the police did not have reasonable suspicion to search the defendant's residence, the Ninth Circuit concluded that while the defendant was only on probation and therefore had more than the complete lack of privacy expectation afforded to the parolee in *Samson*, that expectation "was small, in light of the serious and intimate nature of his underlying conviction for the willful infliction of corporal injury on a cohabitant." *Id.* at 807–09. Against this "slight" intrusion on the defendant's limited expectation of privacy, the court weighed the state's substantial interests in preventing recidivism and reintegrating the probationer, and noted that "the state has a significant need to promote those interests through suspicionless searches of probationers." *Id.* at 809. The Ninth Circuit held "that a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment." *Id.* at 810.

Other courts have adopted *King*'s rationale. *E.g.*, *United States v. Williams*, 650 F. App'x 977 (11th Cir. 2016) (applying *King* in a case involving aggravated carjacking with a firearm); *United States v. Tessier*, 814 F.3d 432 (6th Cir. 2016) (adopting the reasoning in the district court's order and applying *King* in a child-pornography-possession case because "the [s]tate's interest in protecting its young is paramount, and child pornography is, without qualification, a serious crime" (quotation omitted)). And indeed, the Court has not found any federal court authority finding that reasonable suspicion is required despite the presence of a suspicionless search condition under circumstances like those in this case.

The Court finds *King*'s analysis in this line of caselaw persuasive: probationers have a substantially diminished, albeit existent, expectation of privacy; and whether a suspicionless search of a probationer pursuant to a search condition violates the Fourth Amendment depends on the traditional balance of the interests in light of that fact. Here, the government has interests in "apprehending violators of the criminal law, thereby protecting potential victims" from persons more likely to break the law than the average citizen; and reintegrating the probationer into society. *Knights*, 534 U.S. at 120–21. These interests are substantial, *Id.* at 853, and are surely heightened when the crimes at issue involve sexual exploitation of children.

As for Mr. Drake, his expectation of privacy was "significantly diminished" by his status as a probationer and his subjection to very explicit suspicionless search conditions. *Id.* at 121. The crime for which he was originally given probation was second-degree criminal sexual conduct in violation of Minnesota Statutes Section 609.343, subdivision 1—a crime of violence in Minnesota. Minn. Stat § 624.712, subdiv. 5. This is undoubtedly a "serious and intimate" offense—reducing further Mr. Drake's expectation of privacy pursuant to *King*. 736 F.3d at 809; *see also United States v. Tessier*, No. 3:12-77, 2014 WL 4851688, at *8 (D. Tenn. Sept. 29, 2014) (reasoning adopted by *Tessier*, 814 F.3d 432).

Further, whatever expectations of privacy Mr. Drake had in a general way, he would have had less, if any, when it came to the contents of his cellphone. This is not a case in which the government searched a cellphone that a person might have had for years before the encounter. *See generally Riley v. California*, 573 U.S. 373, 393 (2014) (commenting that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse"). As a result of his probation and subsequent violations, Mr. Drake was prohibited for a time from having any phone or internet access. After he finished treatment and several years had elapsed without violation, his probation officers made him an offer: he could have and use a phone for work purposes, so long as he agreed to abide by certain conditions—including the suspicionless search condition. [Tr. at 22–23.] That

is, the search condition pursuant to which the probation officers searched his phone on November 27th, 2018, was not an initial condition to his probation, which forbid all smartphone use, but was a condition of having a phone to search in the first place. The condition was clearly set out in the phone agreement, and Ms. Kovacs reviewed the terms with him. *See Knights*, 534 U.S. at 119 (noting that the search condition was clear and that the defendant was informed of it). Taking all of these factors together, the Court concludes that the search of Mr. Drakes cellphone only minimally—if at all—intruded on his expectation of privacy.

On balance, the scale tips in favor of the government's interests, and the Court finds that, under these particular circumstances, Mr. Drake's probation officers' suspicionless search of his cellphone was not unreasonable. Suppression of the evidence that was discovered as a result of that search is not required.

### 3. The Warrantless Search of Home and Electronic Devices

Mr. Drake also argues that the search of his home by probation officers and the resulting seizure and searches of the computers and hard drive violated the Fourth Amendment. Again, the Court disagrees.

First, for the reasons explored above regarding the cellphone, the Court finds that the government's interests outweigh Mr. Drake's. The Electronic Device Agreement stated that "[b]y signing below, [Mr. Drake] consents to unannounced examination at any time or for any reason, with or without reasonable suspicion, of any electronic device in [his] possession" and that Mr. Drake "has no expectation of privacy regarding the use of any electronic device or the information stored on any electronic device." [Ex. 3 at 1-2.] Further, his probation agreement stated that "[a] probation officer has the authority to conduct unannounced searches of your person, vehicle, computer, or any other property owned, leased, used or under your control." [Ex. 2 at 1; Tr. at 18.] Any reasonable expectation of privacy Mr. Drake had with respect to these items in his home is outweighed by the government's in combating recidivism and reintegrating probationers. *Samson*, 547 U.S. at 849.

13

Additionally, even if the foregoing did not apply, the probation officers certainly had reasonable suspicion to search Mr. Drake's home for the electronic devices following the search of his phone. *Knights*, 534 U.S. at 592 (holding that no more than reasonable suspicion is needed to search the house of a probationer subject to a search condition). There is reasonable suspicion where there is an objective basis for a particularized suspicion of criminal activity. *United States v. Dillard*, 825 F.3d 472, 474 (8th Cir. 2016). It requires "more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause." *United States v. Williams*, 796 F.3d 951, 957 (8th Cir. 2015).

The search of Mr. Drake's cellphone revealed searches for "preteen models" and "minor body parts," which violated the terms of his probation. [Tr. at 33.] The search also revealed that the phone had been connected to devices that Mr. Drake did not disclose on the Electronic Device Agreement [Tr. at 32–33.] These two facts supplied the probation officers with reasonable suspicion that there was evidence of further probation violations or criminal activity on the other devices. *United States v. Rodriquez*, 829 F.3d 960, 962 (8th Cir. 2016) ("[T]he Fourth Amendment required no more than reasonable suspicion that [the defendant] was engaging in criminal activity or otherwise violating the terms of his probation . . . ."); *United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003) (holding that reasonable suspicion of probation violations is sufficient for Fourth-Amendment purposes). Therefore, the search of Mr. Drake's home and electronic devices was reasonable, and the evidence that was obtained as a result should not be suppressed.

## B. *Franks v. Delaware*

Mr. Drake next argues that the January 22, 2019, federal search warrant should be voided and the evidence that resulted from it be suppressed pursuant to *Franks v. Delaware* because Agent Blackmore intentionally or recklessly made false statements in the supporting affidavit, and because the remainder of the affidavit is insufficient to support a finding of probable cause. 438 U.S. 154 (1978). After careful analysis, the Court disagrees.

1. **Legal Standard**

A search warrant that is supported by an affidavit that includes false and misleading statements may be invalidated and the evidence seized pursuant to it suppressed. *Franks*, 438 U.S. at 155–56; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). To allege a Fourth Amendment violation under *Franks v. Delaware*, the burden is on the defendant to show, by a preponderance of evidence, that (1) in the supporting affidavit, the affiant intentionally or with reckless disregard for the truth made false statements or material omissions; and (2) that the affidavit, absent the false statements or omissions, would not support a finding of probable cause. *Id.*; *Franks*, 438 U.S. at 155–56; *United States v. Jacobs*, 986 F.3d 1231, 1234–36 (8th Cir. 1993). "Allegations of negligence or innocent mistake are insufficient" to invalidate the warrant. *Franks*, 438 U.S. at 154.

2. **Analysis**

Mr. Drake asserts that false statements are present in the following paragraph of Agent Blackmore's affidavit:

> On December 5, 2018, Detective Ganley conducted an audio recorded telephonic interview with Drake. During the interview, Drake admitted that he primarily used the Western Digital external hard drive to store child pornography. He further admitted to viewing and downloading child pornography from numerous websites. Drake denied manufacturing, disseminating, or trading child pornography with others. Drake admitted the Western Digital external hard drive contained about 20 videos of child pornography/erotica. Drake also admitted the Western Digital external hard drive contained over one thousand images of child pornography and child erotica.

[Ex. 4 at ¶ 14.] Mr. Drake argues that he never admitted to anything involving child pornography during the December 5th interview, and that any statement suggesting otherwise in the affidavit is an intentional or reckless misrepresentation. As evidence,

15

Mr. Drake points to the fact that the term "pornography" is not mentioned once during the interview and contends that the sole topic of the call was Mr. Drake's probation violation. Because Mr. Drake's probationary conditions included not consuming legal media featuring young girls, and because he could have believed that the topic of the interview was his alleged probation violation, Mr. Drake did not actually admit to any illegal activity. Were this paragraph to be stricken from the affidavit, Mr. Drake argues that the remainder would be insufficient to support a finding of probable cause because the references to pornography being found by the probation searches were related only to the "beliefs" of Agent Blackmore and Detective Ganley. The Court finds Mr. Drake's arguments unpersuasive.

Even crediting Mr. Drake's position and assuming that, in his interview with Detective Ganley, Mr. Drake was only talking about child erotica or other probation-violating materials, this does not support the assertion that either Detective Ganley or Agent Blackmore intentionally or recklessly misrepresented the conversation. After saying they should meet to talk about Mr. Drake's computer, Detective Ganley begins the conversation by saying, "so, you know what's going on now right? . . . I have not sent the computer yet to the lab for forensics, ya know we both know that there's images on there that shouldn't be on there right?" Mr. Drake responds, "correct," and for the rest of the conversation, they only refer to "the pictures," "the videos," "these images," and "them." It is entirely possible that Detective Ganley and Mr. Drake believed they were talking about the same thing but were in fact referring to two different things—child pornography on Detective Ganley's part and child erotica on Mr. Drake's. While this would render the statements in Agent Blackmore's affidavit arguably false, there is no indication that they were knowingly so. Allegations of innocent mistake will not carry a defendant's burden on the first element, and Mr. Drake, despite asserting that these ostensible falsehoods were intentional, offers no argument or evidence—much less a preponderance thereof—to support that assertion. *Franks*, 438 U.S. at 154, 171; *Williams*, 477 F.3d at 559.

Mr. Drake is also unable to meet his burden on the second prong of the *Franks* analysis. Even if the statements Mr. Drake alleges to be knowingly or recklessly false were so, striking those from the warrant would not preclude a finding of probable cause. Removing the facts alleged to be false from Agent Blackmore's affidavit would not eliminate the entire 14th paragraph, but would change it to clarify that Mr. Drake admitted to knowingly possessing prohibited materials involving minors. Because Mr. Drake alleges that he was only referring to child erotica in his interview with Detective Ganley, the references to Mr. Drake's admissions of possessing child erotica would remain. *See United States v. Reinholz*, 245 F.3d 765, 775 (8th Cir. 2001) (setting aside only the misrepresentations in the affidavit). Magistrate Judge Leung has separately determined that, based on a "four-corners" review, Agent Blackmore's affidavit set forth probable cause to support the issuance of the warrant. [R. & R., ECF No. 57 at 8.] Making the changes to the affidavit which Mr. Drake alleges are required by *Franks v. Delaware* does not undermine that showing. And even if paragraph 14 were removed entirely, the remaining paragraphs of the affidavit establish probable cause to search the devices at issue. Agent Blackmore explains that the preliminary searches of the phone and other devices revealed the presence of child erotica and child pornography, and specifically describes three images that had already been reviewed, leaving no doubt as to their status as illegal child pornography. This information alone is enough to support a complete search of the devices accessed by Mr. Drake.

Because Mr. Drake has not met his burden under *Franks v. Delaware*, the January 22, 2019, federal search warrant should not be invalidated and the evidence that came of the ensuing search should not be suppressed.

### C. Motion to Suppress Statements

Mr. Drake also brought a Motion to Suppress Statements. [ECF. No. 33.] However, he has not asserted any independent argument regarding the illegality of the of the interview. If Mr. Drake is seeking suppression on the ground that the statement is fruit of the Fourth Amendment violations he has alleged, the Court's findings

17

regarding the legality of the searches makes such an argument unavailing. Therefore, the Court recommends denial of the motion to suppress Mr. Drake's Statements.

### III. Recommendation

For the reasons set forth above, the Court makes the following recommendations:

1. The Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 26] should be DENIED with respect to Mr. Drake's arguments concerning the search of his phone and misrepresentations in the federal warrant.

2. The Motion to Suppress Statements, Admissions, and Answers [ECF No. 33] should be DENIED.

Date: November 25, 2020

*s/ Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.