# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-CR-49 (NEB/KMM) |
| Plaintiff, | |
| v. | ORDER ACCEPTING REPORTS AND RECOMMENDATIONS |
| GARY ROBERT DRAKE, | |
| Defendant. | |

---

Defendant Gary Robert Drake was charged with two counts of access with intent to view child pornography and one count of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (ECF No. 1.) Drake filed motions to suppress evidence and statements he made to law enforcement. (ECF Nos. 26, 33.) United States Magistrate Judges Tony N. Leung and Katherine Menendez each issued a Report and Recommendation (collectively, "R&Rs") recommending that the Court deny Drake's motions to suppress.[1] Drake objected to the R&Rs. (ECF No. 64 ("Obj.").) Following a *de novo* review, the Court accepts the R&Rs and denies Drake's motions to suppress. (ECF Nos. 26, 33.)

---

[1] Because Judge Menendez issued the warrant that Drake is challenging, Judge Leung issued the R&R on Drake's challenges to the four corners of the warrant. (ECF No. 57 ("Judge Leung R&R").) Judge Menendez issued the R&R on the remaining issues. (ECF No. 58 ("Judge Menendez R&R").)

## BACKGROUND

### I.      Factual Background

The R&Rs provide comprehensive factual background on this case. (Judge Leung R&R at 2–6; Judge Menendez R&R at 1–7.) The Court repeats those facts necessary to understand the present dispute.

In January 2007, Drake pled guilty in state court to two counts of criminal sexual contact with minors. (Judge Menendez R&R at 2; ECF No. 50 ("Hr'g Tr.") at 73.) The court stayed Drake's twenty-one-month prison sentence and placed him on probation for twenty-five years. (Judge Menendez R&R at 2.) In 2008 and 2009, Drake twice violated the terms of his probation by having unsupervised and unauthorized contact with minors. (*Id.*) After the second violation, Drake's access to the internet was revoked entirely. (*Id.*) In 2017, Drake moved into his parents' house in Ramsey County, and his probation was transferred to Ramsey County Community Corrections. (*Id.*) He was assigned a new probation officer—Elizabeth Kovacs. (*Id.*)

In August 2018, Kovacs presented Drake with an Internet Phone Agreement, which would allow him to have an internet-enabled phone, provided that he comply with the conditions laid out in the Agreement. (*Id.* at 2–3; Ex. 2.[2]) Among other things, the Internet Phone Agreement required Drake to allow Ramsey County Probation to

---

[2] The Court's citations to exhibits refer to the exhibits Judge Menendez received during the hearing on the motions to suppress.

randomly search his phone at any time. (Ex. 2.) Though he could have chosen not to enter into the Internet Phone Agreement and foregone an internet-enabled phone, Drake chose to take the phone and sign the agreement. (*Id.*; Hr'g Tr. 59–60.)

Roughly three months later, Drake visited Kovacs's office for a quarterly meeting. (Hr'g Tr. at 25–26.) At this meeting, Kovacs asked Drake to turn over his phone for a random search.[3] (*Id.* at 26.) The search of Drake's phone revealed that he had conducted "concerning searches" that were violative of Drake's probation conditions.[4] (Judge Menendez R&R at 4.)

That evening, Kovacs and another probation officer visited Drake's home to confront him about the results of the search of his phone. (*Id.* at 5.) Drake let the officers in and led them to the basement, where his room was located. (*Id.*) The officers found and seized a Velocity desktop computer, a Gateway desktop computer, and a Western Digital external hard drive. (*Id.*) Each of the computers contained a hard drive, which were later

---

[3] Also at this meeting, Kovacs presented Drake with an updated agreement pertaining to Drake's use of electronics going forward—the Electronic Device Agreement. (*Id.* at 26–27; Ex. 3.) The new Electronic Device Agreement covered not only Drake's use of an internet-enabled phone, but also his use of tablets, computers, external hard drives, and gaming consoles, among other devices. (Ex. 3.) As part of the Electronic Device Agreement, Drake was required to declare all of his electronic devices and some of his online profiles. (*Id.*) Drake signed the agreement and declared only a desktop computer (including his log-in credentials) and a Facebook account. (*Id.*; Hr'g Tr. at 30.) (This new agreement soon became relevant, because Drake had more electronics at his home than he declared.)

[4] In addition, the search indicated that Drake's phone had been connected to devices that Drake had not declared in the Electronic Device Agreement. (*Id.*)

removed. (Ex. 4 ¶ 20; Ex. 5 at 4.) A probation officer then scanned the Velocity computer, which showed that Drake had searched for material that violated the terms of his probation. (Ex. 4 ¶ 12.) Kovacs issued Drake a probation violation and turned the devices over to Detective Mark Ganley of the Roseville Police Department. (Judge Menendez R&R at 5.)

About a week later, on December 5, 2018, Detective Ganley called Drake. (*Id.*) Drake acknowledged that he had images on his devices "that shouldn't be on there." (*Id.* at 5–6 (quoting interview transcript).) Drake admitted that he had downloaded illicit materials and estimated that there were ten videos and perhaps a thousand pictures on his devices. (*Id.* at 6.) Detective Ganley believed that Drake was admitting to possessing child pornography, but Drake later claimed he thought he and Detective Ganley were talking about "child erotica." (*Compare* Ex. 5 at 4 (Detective Ganley stating in the warrant application that Drake had admitted to viewing and downloading child pornography), *with* ECF No. 51 at 19–21 (claiming that Drake only admitted to viewing and downloading child erotica) *and* Hr'g Tr. at 74–75 (defense counsel refuting the assertion that Drake admitted to possessing child pornography and claiming that Drake merely had on his computer images he "should not have been looking at related to minors").)

After his conversation with Drake, Detective Ganley applied for a state search warrant. (Judge Menendez R&R at 6.) In his affidavit, Detective Ganley stated that he had interviewed Drake and that Drake "admitted viewing and downloading child

pornography." (*Id.*) This search warrant was issued but never executed. (*Id.*; Ex. 5.) Instead, in late December 2018, Detective Ganley transferred the devices to Federal Bureau of Investigation Agent Robert Blackmore. (Judge Menendez R&R at 7.)

Agent Blackmore applied for a federal warrant to search the seized devices. (*Id.*) In the affidavit, Agent Blackmore summarized Detective Ganley's interview with Drake, saying that Drake had "admitted that he primarily used the Western Digital external hard drive to store child pornography" and "further admitted to viewing and downloading child pornography from multiple websites." (Ex. 4 ¶ 14.) Judge Menendez issued the warrant on January 22, 2019. (Judge Menendez R&R at 7.) The search of the devices revealed evidence of child pornography. (*Id.*)

## II.   Procedural Background

The United States then charged Drake with two counts of Access with Intent to View Child Pornography and one count of Possession of Child Pornography. (*Id.*; ECF No. 1.) Drake filed several motions, among them these two motions to suppress. (ECF Nos. 26, 33.) In support of one motion, Drake argued that the initial search and seizure of Drake's devices violated the Fourth Amendment; that the federal search warrant lacked probable cause and contained a misrepresentation of a statement Drake made; and the search of the Western Digital hard drive was impermissible, because it was not particularly described in the federal search warrant. (ECF No. 51.) Drake also filed a second motion, (ECF No. 33), but seemingly did not make independent arguments in

support of this motion. (Judge Menendez R&R at 17 (noting that Drake "has not asserted any independent argument regarding the illegality of the [] interview").)

On November 25, 2020, Judges Leung and Menendez each issued an R&R, both of which recommended that the Court deny Drake's motions to suppress. Judge Leung concluded that the federal search warrant was supported by probable cause, even if Agent Blackmore's account of Detective Ganley's conversation with Drake were stricken. (Judge Leung R&R at 6–10.) Judge Leung also determined that, although the Western Digital hard drive was not described with sufficient particularity in the federal search warrant, the evidence found on the hard drive should not be subject to the exclusionary rule because Agent Blackmore acted in good faith when executing the search warrant. (*Id.* at 10–16.)

In her R&R, Judge Menendez concluded that the probationary searches of Drake's devices did not violate the Fourth Amendment and that even if Agent Blackmore made a misrepresentation in his application for a search warrant, the misrepresentation was not made intentionally or recklessly, so evidence searched pursuant to the federal search warrant need not be suppressed. (Judge Menendez R&R at 7–17.)

Drake objects to the conclusions in the R&Rs. Specifically, Drake claims that Judge Menendez erred in determining that the probationary search of Drake's phone and his home did not violate the Fourth Amendment and that Agent Blackmore did not make intentional or reckless misrepresentations in his application for a search warrant. (Obj. at

6

2–14.) He also objects to Judge Leung's finding that the good-faith exception to the exclusionary rule applies to the search of the Western Digital hard drive. (*Id.* at 14–16.)

## ANALYSIS

The Court conducts a *de novo* review of the parts of the R&Rs to which Drake objects. 28 U.S.C. § 636(b)(1); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995).

### I.   Probationary Search of Drake's Phone

The bulk of Drake's objection is devoted to his argument that the initial probationary search of his phone violated the Fourth Amendment. (Obj. at 2–12.) Drake claims that the search required reasonable suspicion, which the government admits it did not have.

#### A. *Legal Standard*

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting U.S. Const. amend. IV). Although warrantless searches and seizures are generally disfavored, a state administering a probation system presents "special needs," which may "justify departures from the usual warrant and probable-cause requirements." *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987). Even absent a warrant, a search must nevertheless be reasonable. *Id.* at 873. To determine whether a search was reasonable, a court must weigh "the degree to which it intrudes upon an individual's privacy" against "the degree

to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001).

When the subject of a search is a probationer, this status "informs both sides" of this balance. *Id.* at 119. A probationer has a "significantly diminished" expectation of privacy because his or her freedoms have already been circumscribed by virtue of being on probation. *Id.* ("[P]robationers do not enjoy the absolute liberty to which every citizen is entitled.") (quotation omitted); *United States v. Makeeff*, 820 F.3d 995, 1000 (8th Cir. 2016). A probationer's expectation of privacy is further diminished when he or she is subject to a search condition. *Makeeff*, 820 F.3d at 1000. Similarly, the government's interest in searching a person on probation is heightened, based in part on the assumption that a probationer is more likely to violate the law. *Knights*, 534 U.S. at 120–21; *Makeeff*, 820 F.3d at 1000.

The search condition here takes center stage because it explicitly allows Drake to have an internet-enabled phone so long as he agrees (and he did) that his probation officer can search it without any suspicion, reasonable or not. Neither the Supreme Court nor the Eighth Circuit has specifically addressed what level of cause or suspicion (if any) is necessary to conduct a probationary search when the probationer is subject to a search condition. In *Knights*, the Supreme Court held that "*no more than* reasonable suspicion" is necessary to conduct a probationary search of a probationer subject to a search condition. 534 U.S. at 121 (emphasis added). The *Knights* Court left open the question of whether a

search of a probationer subject to a search condition would be constitutional if the officer

acted without any individualized suspicion. *Id.* at 120 n.6.

In *Samson v. California*, the Supreme Court partially addressed this issue, holding

that a parolee subject to a search condition had no legitimate expectation of privacy, and

thus a search was permissible even absent individualized suspicion. 547 U.S. 843, 852

(2006). In so holding, the Supreme Court distinguished probationers from parolees. *Id.* at

850. It relied on the assumption that "parolees have fewer expectations of privacy than

probationers, because parole is more akin to imprisonment than probation is to

imprisonment." *Id.* at 850. In other words, on the "continuum of possible punishments,

parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's

absolute liberty than do probationers." *Id.* (quoting *United States v. Cardona*, 903 F.2d 60,

63 (1st Cir. 1990)).

Then in *Makeeff*, the Eighth Circuit analyzed whether probation officers had

reasonable suspicion to seize and search Makeeff's USB drive. 820 F.3d at 1000–03.  The

terms of Makeeff's supervised release required him to submit to searches only when the

probation officer had "reasonable suspicion of contraband or evidence of a violation of a

condition of release." *Id.* at 998. The Eighth Circuit noted, quoting a Second Circuit case,

that searches of a probationer subject to a search condition are permissible "if based upon

reasonable suspicion (or potentially a lesser standard)." 820 F.3d at 1001 (quoting *United*

*States v. Lifshitz*, 369 F.3d 173, 181 (2d Cir. 2004) (in turn citing *Knights*, 534 U.S. at 112,

and *Griffin*, 483 U.S. at 868)). It gave no further guidance that would assist the Court in this case.

Other Circuits, however, have given such guidance, addressing the specific issue of whether probation officers may conduct suspicionless searches of probationers subject to a search condition. In *United States v. King*, the Ninth Circuit held that a suspicionless search conducted pursuant to a probationary search condition did not violate the Fourth Amendment. 736 F.3d 805, 810 (9th Cir. 2013). The court in *King* held that the search was reasonable, even absent individualized suspicion, because the probationer's legitimate expectation of privacy was slight and the government had several substantial interests in conducting the search. *Id.* at 808–10.[5]

---

[5] In his objection, Drake argues that the Ninth Circuit later limited *King* in *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016). (Obj. at 4–6.) In *Lara*, however, the Ninth Circuit merely noted that a probationer's acceptance of a search condition does not, by itself, render a search constitutionally permissible. 815 F.3d at 609. This principle inheres in the totality-of-the-circumstances reasonableness that courts apply in this context—courts consider not just whether the probationer is subject to a search condition, but also other factors affecting the probationer's expectation of privacy. And although the Ninth Circuit held that the search in *Lara* was unconstitutional, the facts here differ substantially. First, the offense that resulted in Lara being placed on probation—a nonviolent drug crime—was less serious than the underlying offense here. *Lara*, 815 F.3d at 610. In other words, the government has more of an interest in discovering and preventing sexual contact with minors than it does nonviolent drug crimes. Second, the search condition in *Lara* was ambiguous as applied to the search. Specifically, the places and things that probation officers were allowed to search ("any residence, premises, container, or vehicle") did not "clearly or unambiguously" include Lara's cellphone and the information it contained. The same problem is not present here; Drake unambiguously consented to a search of his phone. (Ex. 2.) Thus, *Lara* is distinguishable from the present facts.

Similarly, in *United States v. Tessier*, the Sixth Circuit held that a suspicionless search of a probationer subject to a search condition did not violate the Fourth Amendment. 814 F.3d 432, 435 (6th Cir. 2016). It adopted the reasoning of the district court, which concluded that the probationer had only a slight expectation of privacy and the government had substantial interests in conducting the search. *Id.*; *United States v. Tessier*, No. 13-00077, 2014 WL 4851688, at *7–*8 (M.D. Tenn. Sept. 29, 2014). The Eleventh Circuit, citing both *King* and *Tessier*, has also approved a suspicionless search of a probationer subject to a search condition. *United States v. Williams*, 650 F. App'x 977, 979–80 (11th Cir. 2016).

### B. Application

Rather than apply any broad rule to suspicionless searches of probationers subject to search conditions, the Court will, as the cases discussed do, analyze the reasonableness of the search based on the totality of the circumstances. The Fourth Amendment demands this specific inquiry, in which the Court weighs, "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Makeeff*, 820 F.3d at 1000 (quoting *Knights*, 534 U.S. at 118–19). Put more simply, whether a search is reasonable necessarily depends on the facts of a particular case. *See Smook v. Minnehaha Cnty.*, 457 F.3d 806, 810 (8th Cir. 2006) (noting that determining the constitutionality of a search conducted without individualized suspicion is a fact-specific inquiry); *Missouri v.*

*McNeely*, 569 U.S. 141, 150 (2013) (first quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996);

and then quoting *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931)) (noting

that the reasonableness of a search or seizure is "fact-specific" and must be assessed

"based 'on its own facts and circumstances'"); *United States v. Hughes*, 517 F.3d 1013, 1017

(8th Cir. 2008) (citing *Robinette*, 519 U.S. at 39) ("The Supreme Court has 'consistently

eschewed bright-line rules [under the Fourth Amendment], instead emphasizing the fact-

specific nature of the reasonableness inquiry.'") (alterations original).

1. *Drake's Expectation of Privacy*

Drake has, at most, a meager expectation of privacy in the contents of his phone.

In general, probationers have a diminished expectation of privacy compared to the

general public. *Knights*, 534 U.S. at 119. This diminished expectation of privacy is further

reduced when the probationer is subject to a search condition. *Id.* at 119–20; *Makeeff*, 820

F.3d at 1000. At the time probation officers took Drake's phone from him and searched it,

Drake was subject to the Internet Phone Agreement, which conditioned his possession

and use of a cell phone on Ramsey County Probation/Parole being able to access his

phone at any time. (Ex. 2.) This search condition was not unilaterally imposed on Drake;

rather, he consented to it in exchange for access to an internet-enabled phone, which he

had not previously had while on probation. (Hr'g Tr. at 22.) Thus, Drake consented to a

further diminishment of his privacy interests.

As the Supreme Court has explained, probation, parole, and supervised release exist on a continuum of severity. *Knights*, 534 U.S. at 118. The Eighth Circuit has distinguished supervised release from probation and parole, noting that "supervised release is a more severe punishment than parole and probation, and involves 'the most circumscribed expectation of privacy.'" *United States v. Jackson*, 866 F.3d 982, 985 (8th Cir. 2017) (citing *Makeeff*, 820 F.3d at 1011). This observation, however, is not absolute: while "parolees have fewer expectations of privacy than probationers," *Samson*, 547 U.S. at 850, it is also true that, depending on the conditions imposed, a particular probationer may have an expectation of privacy that is similar to that of a parolee. Terms of probation and parole vary, and not every sentence of probation will diminish a person's expectation of privacy less than a parole sentence. *See State v. Jones*, 869 N.W.2d 24, 29 (Minn. 2015) (noting that sentencing courts must balance a probationer's interest in freedom against the government's interest in rehabilitation and reintegration); *State v. Vargas*, No. A17-0586, 2017 WL 5560187, at *2 (Minn. Ct. App. Nov. 20, 2017) ("Minnesota's district court judges are entrusted to make difficult decisions that balance the probationer's freedom and public safety."). Further, courts have significant latitude to impose conditions when ordering probation, so a particular probationer's expectation of privacy may not be the same as other probationers' expectations. *See* Minn. Stat. § 609.135, subdiv. 1(a)(2) (permitting a court to impose probation "on the terms the court prescribes"); *United States v. Shively*, No. 18-CR-00181, 2018 WL 4008987, at *2 (W.D. La. Aug. 22, 2018) (citing *United*

*States v. Miller*, 634 F.3d 841, 843 (5th Cir. 2011)) (explaining that a court has "substantial latitude" to craft a sentence for a defendant who has violated the terms of his supervised probation). Because different conditions of probation may lead to different expectations of privacy, the Court will consider the conditions imposed on the particular probationer in determining his expectation of privacy.

Here, Drake is subject to numerous probationary conditions that significantly diminish his expectation of privacy. Per his original probation agreement, Drake was not permitted to have contact with minors, and had to submit to unannounced searches of his person, vehicle, and computer. (Ex. 1.) After his first probation violation, Drake not only served time in custody, but was also subject to random computer audits, forbidden from using the internet without a probation officer's approval, and was not permitted to consume media intended for girls age seven through fifteen. (Ex. 8.) When Drake again violated the terms of his probation in 2009, he had to serve another thirty days in custody and the restrictions on his internet access continued. (Hr'g Tr. at 21.) Thus, Drake was subject to conditions that greatly restricted his expectation of privacy. As a result of these conditions and the Internet Phone Agreement's search condition, Drake had a marginal, but nevertheless existent, expectation of privacy.

    2.  *Government's Interest*

On the other side of the balance, the government had a substantial interest in searching Drake's phone. First, the government has an interest in ensuring citizens

comply with the law, thus protecting potential victims. *Knights*, 534 U.S. at 121. Probationers are not only more likely to break the law, but they have greater incentives to hide evidence that they have broken the law. *Id.* at 120. This interest is too general to be sufficient to uphold the Drake phone search, but here it was far more specific and significant—the probationer pled guilty to criminal sexual conduct involving a minor. *See Tessier*, 2014 WL 4851688, at *8 (explaining that the government has a substantial interest in protecting children and that child pornography is a serious crime). Second, the government has an interest in "discovering criminal activity and preventing the destruction of evidence." *King*, 736 F.3d at 809. Third, the government has an interest in a probationer's "successful completion of probation and in his or her reintegration into society." *Id.* A probation officer's ability to conduct a suspicionless search "serves [the government's] interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of [probationers] into productive society." *Samson*, 547 U.S. at 854.

All three of these interests, when viewed in the context of this case, are served by the search of Drake's phone. Drake pled guilty to criminal sexual conduct as a result of his inappropriate contact with minors. (Hr'g Tr. at 16; ECF No. 54 at 2.) In 2008, he violated the terms of his probation by having unsupervised contact with minor females and accessing the internet. (Judge Menendez R&R at 2; Ex. 8.) He again violated the terms of his probation in 2009. (Hr'g Tr. at 19, 21.) These facts suggest that Drake is more likely to recidivate, which the government has an interest in preventing. Further, if Drake were

to use his electronic devices to commit a crime or violate the terms of his probation, the government would have an interest in discovering this criminal activity and preserving evidence of it. *King*, 736 F.3d at 809.

Finally, the provision permitting probation officers to search Drake's phone without individualized suspicion serves a deterrent function which helps hasten Drake's reintegration into society. The Supreme Court has explained that parolees "require intense supervision" to help aid with "handl[ing] the pressures of reintegration," *Samson*, 547 U.S. at 854, and the Court sees no reason why this principle would not also hold true for probationers. Reducing recidivism is central to the process of a probationer reintegrating into society. *Id.* at 853 ("[R]educing recidivism . . . promot[es] reintegration and positive citizenship among probationers . . ."). A suspicionless search provision reduces recidivism by deterring probationers from violating the terms or their probation or committing new crimes. *Id.* at 854 (explaining that to require reasonable suspicion to search a parolee would "give parolees greater opportunity to anticipate searches and conceal criminality"); *see United States v. Winston*, 850 F.3d 377, 381–82 (8th Cir. 2017) (explaining that search conditions deter future crimes). Thus, the suspicionless search provision Drake is subject to serves a deterrent effect which reduces his chances of recidivating, which in turn promotes his reintegration into society.

This Court cannot (and should not) state that every suspicionless search of a probationer who is subject to a search condition will be constitutionally permissible. But it can conclude that, based on the specific facts presented here, the government's interest in the search of Drake's phone substantially outweighs the intrusion into Drake's slight expectation of privacy. As such, the search was reasonable and did not violate the Fourth Amendment.

### C. Drake's Objections

In his objection to the R&Rs, Drake argues that the facts of his case are distinguishable from those in *Knights*, *Samson*, *King*, *Tessier*, and *Williams*. (Obj. at 4.) Specifically, Drake argues that those cases are inapposite because they were "evaluated upon statutory language related to probationary searches" or "related to specific facts as to timing." (*Id.*) To the extent that any of these cases discuss statutory language, this is irrelevant. In *Samson*, for instance, the Supreme Court was faced with the question of whether California statutory requirement that parolees be subject to suspicionless searches violated the Fourth Amendment. 547 U.S. at 846. Courts have not considered the source of the search condition when assessing whether a warrantless search of a probationer subject to a search condition is reasonable. Regardless of the source of the search condition, a probationer subject to such a condition has a diminished expectation of privacy compared to someone who is not subject to a search condition. *Knights*, 534 U.S. at 119–20.

Drake also argues that the time that has elapsed since his guilty plea and probation violations renders his case distinguishable from the cases upholding similar searches. (Obj. at 3, 8.) Although it has been more than a decade since Drake's last probation violation, given the seriousness of the offense and the nature of the search condition, as set forth above, this fact does not dictate a different outcome.

Drake attempts to distinguish his case from *Williams* and *Tessier* specifically. (Obj. at 6–8.) As for *Williams*, Drake notes that the defendant there was convicted of carjacking using a gun and served time in prison before being released subject to the search condition. *Williams* did not limit its holding to those facts. *See* 650 F. App'x at 980 (holding the suspicionless search to constitutional because of Williams's similarity to the probationers in *King* and *Tessier*, and because the search was conducted "in main part" by probation officers). The underlying crime is relevant to the reasonableness analysis, but if Drake is implicitly arguing that criminal sexual contact with a minor is a less serious crime for which the government has a lesser justification in preventing, this argument fails. *See Tessier*, 2014 WL 4851688, at *8 (concluding that sexual exploitation of a minor was a serious crime for which the government had a substantial interest in preventing).

Drake attempts to distinguish *Tessier* on the basis that the defendant in that case was convicted of a crime involving the use of technology, was placed on *supervised* probation (as opposed to regular probation), and could petition the court for modification of the terms of his probation. (Obj. at 7–8.) None of these distinctions is persuasive.

18

Though Drake was not convicted of a crime involving the use of technology, the sentencing court thought that Drake's use of the internet posed a significant enough risk of harm to justify prohibiting him from using the internet. (Ex. 8.) The difference between "supervised probation" and probation in *Tessier* appears merely semantic. *See* 2014 WL 4851688, at *2, *7–*8 (not drawing any distinction between "supervised probation"—a term only mentioned once—and probation, and analyzing Tessier's Fourth Amendment claim based on Tessier's status as a probationer). That Tessier could petition the court for modification of the terms of probation did not factor into the *Tessier* court's analysis, and this is not a viable basis on which to distinguish the facts of this case. Further, it is inaccurate to say that Drake lacked the ability to change the terms of his probation agreement, at least as it concerns his use of a cellphone and other electronic devices. The ability to possess and use a phone was Drake's choice. (Hr'g Tr. at 22.) Presumably then, Drake could have freed himself from the search condition by relinquishing his phone and other electronic devices.

Drake also argues that the search condition cannot be the basis for finding the search to be constitutional because it was a contract of adhesion. (Obj. at 8–9.) To the extent Drake contends that he had no choice but to submit to the search condition, this suggestion is plainly false. Accepting the terms of the Internet Phone Agreement, and later the Electronic Device Agreement, represented a choice on Drake's part. Drake was offered a deal: he could possess and use an internet-capable phone so long as he complied

19

with certain conditions, including the search condition. (Hr'g Tr. at 22–24; Ex. 2.) At that

juncture, Drake could have accepted or rejected these terms. (Hr'g Tr. at 59–60 (testifying

that Drake could have opted not to have a phone rather than accept the agreement).) He

chose the former. By so choosing, Drake became subject to the Internet Phone

Agreement's conditions. Thus, Drake had a meaningful choice to accept or reject the

additional restrictions.

Drake next cites various state court cases in support of his contention that "under

Minnesota law, suspicionless searches are dubious and case law requires reasonable

suspicion." (ECF No. 64 at 9–11.) The Court, however, does not look to state law when

analyzing a Fourth Amendment issue. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008)

(counselling against "linking Fourth Amendment protections to state law"); *Engleman v.

Deputy Murray*, 546 F.3d 944, 948 n.3 (8th Cir. 2008) (citing *Moore*, 553 U.S. at 172, 176).[6]

## II.   Probationary Search of Drake's House

Drake also objects to Judge Menendez's finding that the probation officers' search

of his home did not violate the Fourth Amendment. (Obj. at 12–13.) Drake claims that this

---

[6] In any event, these cases are unpersuasive. For instance, Drake cites *State v. Reyes* for the proposition that reasonable suspicion is required for a probationary search. No. A19-0647, 2020 WL 132538, at *2 (Minn. Ct. App. Jan. 13, 2020). *Reyes* cites to *State v. Anderson*, which merely reiterates *Knights*'s holding that "no more than reasonable suspicion" was required. 733 N.W.2d 128, 140 (Minn. 2007). *State v. Kujava*, another case Drake cites, similarly cites to *Anderson*. No. A19-0930, 2020 WL 2841853, at *2 (Minn. Ct. App. June 1, 2020). *Kujava* also stands for the uncontroverted principle that a search condition, does not, by itself, justify a probationary search. *Id.* In sum, Drake's state court citations do not offer anything substantive to the analysis differing from the Court's discussion above.

search cannot be justified by the search condition, and also that the search of the home was derived from the search of Drake's phone and is thus a fruit of a poisonous tree. (*Id.*) First, as discussed above, the search condition does not, by itself, render the search constitutional. Rather, it is a factor to consider when evaluating the degree to which Drake had a reasonable expectation of privacy in his home. Same as above, the government's interest in seizing and searching Drake's electronic devices outweighs Drake's fractional expectation of privacy.

Second, Drake's fruit of the poisonous tree argument fails. Evidence is subject to the exclusionary rule when it is derived from illegally obtained evidence. *United States v. Simpson*, 439 F.3d 490, 493 (8th Cir. 2006). But because the search of Drake's phone was not unconstitutional, there is no poisonous tree, and thus no poisoned fruit. The search of Drake's house therefore was not unconstitutional.

### III.   *Franks* and the Alleged Misrepresentation in the Warrant Application

Drake's third challenge is to an allegedly inaccurate synopsis of Detective Ganley's conversation with Drake contained in the application for the federal search warrant. In his interview with Detective Ganley, Drake admitted to having videos and pictures on his computer that should not have been there, including "images of [] children." (Ex. 7 at 2–4.) In Agent Blackmore's affidavit in support of his application for a search warrant, he represented that, in the interview, Drake admitted to possessing child pornography. (Ex. 4 ¶ 14.) Drake, however, contends that he was talking about child erotica, rather than

child pornography. (ECF No. 51 at 19–20.) Judge Menendez concluded that, even if Drake was only admitting to possessing child erotica, Agent Blackmore's alleged misrepresentation was not made intentionally or recklessly, and thus evidence obtained pursuant to the search warrant need not be suppressed.

Drake argues, with scant support, that Judge Menendez was wrong to conclude that this error should not lead to suppression.[7] When evidence is obtained under a warrant that was supported by false and misleading statements, that evidence may be suppressed under certain conditions. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). To succeed in such a challenge, the defendant must show by a preponderance of the evidence that (1) the affiant intentionally or recklessly made false statements or omitted facts; and (2) that the affidavit, with the omitted facts or without the false statements, would not be sufficient to establish probable cause. *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

Drake has not met the first prong, and likely would not meet the second. Drake offers no more than mere speculation regarding Agent Blackmore's mental state when he

---

[7] In his objection, Drake misrepresents Judge Menendez's reasoning. Drake claims that Judge Menendez admitted that it was "false" that Drake ever admitted to possessing child pornography. (Obj. at 13.) This representation itself is false. In her R&R, Judge Menendez said that "[e]ven crediting Mr. Drake's position" and assuming Drake was admitting only to possessing child erotica, then Agent Blackmore's statement in the affidavit was "arguably false." (Judge Menendez R&R at 16.) Thus, contrary to Drake's assertion, Judge Menendez never concluded that Detective Ganley's account of his interview with Drake or Agent Blackmore's statement truly was false.

made these alleged misrepresentations—he only argues, without support, that "[h]is intent is clear." (Obj. at 14.) To the contrary, it is not at all clear that Agent Blackmore acted intentionally or recklessly. Even if paragraph fourteen of the affidavit contained a misrepresentation, this is just as easily explained by "negligence or innocent mistake," mental states on which a *Franks* challenge may not be based. *Franks*, 438 U.S. at 171. Drake has not shown, by a preponderance of the evidence, that Agent Blackmore made intentional or reckless misstatements.

Even if Drake had been able to make such a showing and paragraph fourteen were struck from the affidavit, there would be enough substance left in the affidavit to support a finding of probable cause. The affidavit notes that Drake used his phone to conduct inappropriate searches in violation of his probation conditions, including for "preteen girls," "jailbait," and "female child models." (Ex. 4 ¶ 10.) It also explains that a scan of Drake's computer showed searches for child pornography and erotica, and that Drake had used the computer to download illicit images. (*Id.* ¶¶ 12, 18.) The affidavit also detailed images of child pornography that Agent Blackmore found on Drake's computer. (*Id.* ¶ 17.) Thus, even if paragraph fourteen were omitted from the affidavit, what would be left would be enough to establish probable cause. Drake's *Franks* challenge therefore also fails on the second prong.

IV.     **The Western Digital Hard Drive and the Good Faith Exception**

Drake's final objection is that Judge Leung incorrectly concluded that, due to the

good faith exception, the Western Digital hard drive should not be suppressed.

Though Drake's Western Digital hard drive is mentioned multiple times in Agent

Blackmore's affidavit as an item that was seized from Drake's house and was listed in an

attachment as an item to be searched, the search warrant itself does not list it. (Ex. 4 at

16.) Judge Leung concluded that even though the Western Digital hard drive was not

described with sufficient particularity, Agent Blackmore relied in good faith on the

warrant when searching the device, and thus it is not subject to the exclusionary rule.

(Judge Leung R&R at 10–16.)

A warrant must "particularly describ[e] the place to be searched, and the persons

or things to be seized." *United States v. Pennington*, 287 F.3d 739, 744 (8th Cir. 2002)

(quoting U.S. Const. amend. IV). A search conducted pursuant to a warrant that does not

meet this particularity requirement is unconstitutional. *Massachusetts v. Sheppard*, 468 U.S.

981, 988 n.5 (1984). A particular description of the thing to be searched contained in

supporting documents is insufficient; "[t]he Fourth Amendment by its terms requires

particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S.

551, 557 (2004).

Here, the Western Digital hard drive was not mentioned in the search warrant.

(Ex. 4 at 16.) The warrant references an "Attachment A," but the Western Digital hard

drive is not specifically mentioned here either. (Ex. 4 at 18–20.) Therefore, the Western Digital hard drive was not described with the requisite particularity in the warrant, and the exclusionary rule would ordinarily apply. *See Sheppard*, 468 U.S. at 988 n.5.

Although evidence obtained in violation of the Fourth Amendment is usually subject to the exclusionary rule, there are certain exceptions. *Herring v. United States*, 555 U.S. 135, 141 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."). One of these is the good-faith exception established in *United States v. Leon*, 468 U.S. 897, 923–25 (1984). When an officer acts "in objectively reasonable reliance on a subsequently invalidated search warrant," evidence he or she obtains need not be excluded. *Id.* at 922. Such evidence should only be excluded if doing so would "further the purposes of the exclusionary rule"—that is, if exclusion would deter similar police conduct in the future. *Id.* at 918–19; *Herring*, 555 U.S. at 144.

The good-faith exception applies here because the record suggests that Agent Blackmore was acting in reasonable reliance on the warrant when he searched the Western Digital hard drive. Agent Blackmore's affidavit includes numerous mentions of the Western Digital hard drive as an item to be searched. (Ex. 4 ¶¶ 3(e), 11, 14.) It is also included in Attachment A to Agent Blackmore's affidavit, which lists the items to be searched. (*Id.* at 11.) The caption of the warrant is "In the Matter of the Search of: Items Seized From the Residence of Gary Robert Drake During a Probation Search . . ." (*Id.* at

16.) The Western Digital hard drive fits that description. Taken together, Agent Blackmore could have reasonably concluded that the warrant authorized the search of the Western Digital hard drive. The omission of the Western Digital hard drive in the body of the warrant appears to be a clerical error—an innocent mistake. Such clerical errors do not merit exclusion of evidence. *United States v. Curry*, 911 F.2d 72, 78 (8th Cir. 1990); *Sheppard*, 468 U.S. at 988–91.

Drake takes a narrower view of the applicability of the good-faith exception, claiming, without support, that it does not apply to searches conducted pursuant to a warrant that does not list the items to be searched. (Obj. at 14.) This is not true. The good-faith exception applies not only when the issuing judge incorrectly determines that the warrant is supported by probable cause, but also when the warrant contains a clerical mistake. *Curry*, 911 F.2d at 78; *Sheppard*, 468 U.S. at 988–91.

## V.   Remaining Aspects of the R&Rs

The Court has reviewed the remaining aspects of the R&Rs that Drake has not specifically objected to for clear error. *See* Fed. R. Crim. P. 59(b); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (per curiam). Finding no clear error in the parts not objected to and following a *de novo* review of the elements of the R&Rs to which Drake has objected, the Court adopts the R&Rs and denies Drake's motions to suppress.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.    The Reports and Recommendations (ECF Nos. 57, 58) are ACCEPTED; and

2.    Defendant's Motions to Suppress (ECF Nos. 26, 33) are DENIED.


Dated: February 3, 2021                    BY THE COURT:

                                           s/Nancy E. Brasel
                                           Nancy E. Brasel
                                           United States District Judge